Mrs. Wesley Williams, Administratrix of Ra-
chel Williams *vs.* Adeline Johnson, Admin-
istratrix of John Johnson.

*Slavery — Construction of Statutes — Effect of the
abolition of Slavery upon a pending action to re-
cover the value of a Slave.*

. Slavery as it existed in this State, was not the creature of statutory law.

A statute ought not to have a retroactive operation, unless its words are
so clear, strong and imperative, that no other meaning can be annexed
to them, or unless the intention of the Legislature could not be other-
wise satisfied.

Slavery being established by the municipal law of the State, its abolition
by the Constitution of 1864, did not defeat a pending action of *trover*,
brought to recover the value of a slave.

Appeal from the Circuit Court for Howard County.

This was an action of *trover* brought by Rachel Williams,
the appellant's intestate, on the 15th of October, 1860, in the
Circuit Court for Anne Arundel county, against John John-
son, the intestate of the appellee, whereby she sought to
recover the value of a certain negro man, her slave.

At the October Term, 1860, of that Court, the defendant
was summoned and appeared by his counsel, who at April
Term following entered a general demurrer to the *nar.*, to
which there was a joinder.

At April Term, 1862, the demurrer, not having been dis-
posed of, was withdrawn by the defendant, and upon his
motion the case was removed to Howard county.

Subsequently the death of the plaintiff was suggested, and
her administratrix, the present appellant, became a party to
the suit, and on suggestion of the death of the defendant, the
present appellee, as his administratrix, became the party de-
fendant.

At September Term, 1865, the general issue was pleaded.
At March Term, 1867, by agreement the plea was withdrawn

and the defendant demurred to the *nar.*, and the plaintiff joined in the demurrer. The demurrer was held good by the Court, and judgment was entered thereon. The plaintiff appealed.

The cause was argued before BARTOL, C. J., STEWART, BRENT, ALVEY, and ROBINSON, J.

*Frank. H. Stockett*, for the appellant :

The single point submitted to this Court, is the effect of the abolishment of slavery by the Constitution of 1864, on the right of the plaintiff to recover in this action for the loss of her intestate's slave, by the wrongful act of the defendant's intestate.

The constitutional provision terminating slavery, in no way affected the right of the plaintiff to maintain the present action—the right of the plaintiff was a vested right, and incapable of being divested. The right to recover for the wrong complained of, had accrued and become a vested right immediately on the consummation of the wrong, and long before the law abolishing slavery was in existence; and the construction contended for, would be to give to it an *ex post facto* operation. As against such construction as this, the Courts have always decided, and the current of decisions is uniform, decided and unbroken.

As a general rule, statutes are never so construed, unless it should clearly appear that such was intended by the express words of the law, and not even then, if by such construction the law would divest vested rights. *Smith's Com. on Stat. Law, &c.*, secs. 533, 760, 761, 763, 775 ; *Gilmore vs. Shuter*, 2 *Mod.*, 310—*same case, Sir Thos. Jones*, 108 ; *Dash vs. Van Kleek*, 7 *John. Rep.*, 477 ; *Lewis vs. Brackenridge*, 1 *Black.*, 220 ; *Prof. Ken. Pur. vs. Laforce*, 3 *Green.*, 275 ; *Lewis vs. Webb*, 3 *Green.*, 326 ; *Saterlee vs. Matherson*, 2 *Peters*, 380 ; *Wilkinson vs. Leeland*, 2 *Peters*, 627 ; *Butler vs. Palmer*, 1 *Hill*, 324 ; *Steamship Co. vs. Joliffe*, 2 *Wallace*, 450.

*Alexander B. Hagner,* for the appellee:

Slavery in Maryland had its legal support only in the *local* or *municipal law* of the State; the constitutional abolition of the institution in 1864, operated a complete repeal of this local law, and left slavery without any *legal* support; the usual consequences of a repeal upon *inchoate* rights, having their origin and support in the repealed law, applied to this constitutional abrogation of slavery, and the cause of action in this case was an *inchoate* right at the time of the adoption of the Constitution, and perished as an incident, with the destruction of slavery itself.

If slavery ever existed in England, (which is denied by all the legal authorities,) it had disappeared centuries before the settlement of Maryland, and the Act of Parliament respecting the slave trade did not operate to change the *common law,* so as to tolerate its existence in that country.   *Mahoney vs. Ashton,* 4 *H. & McH.,* 303.

The decision in *2nd Ld. Raymond,* 1274, that *trover* would not lie for a negro, and the judgment in *Somerset's case,* 1 *Lofft.,* 17, that a slave, held as such under the local laws of a colony, became free on reaching England, are founded on this axiom in English law.

The colonists of Maryland claimed to have brought with them to their new homes the *common law* of England.   It was not by virtue of that law that they could defend their holding of slaves, when negroes were first introduced into the provinces, after their importation into Virginia, in 1620.   Between the first introduction of negroes into Maryland, after the settlement in 1632, and the year 1663, no *common law* of the province had grown up which could have been pleaded in a provincial Court, in defence of their enslavement.   The common law can only acquire force by *immemorial* usage, certainly not within thirty-one years.

In 1663, chapter 30 was passed, which expressly declared that all negroes within the province, and their descendants, should be slaves.   This Act was continued and made per-

petual by the Act of 1675, ch. 2, and these laws constituted the first legal defence which a Court could have recognized in a controversy as to the master's right. *Butler vs. Boarman,* 1 *H. & McH.,* 371.

But even if there were then in Maryland an *unwritten* law which might have been invoked in a Maryland Court in defence of the master's claim, still it was merely a *local* or *municipal* custom, as contradistinguished from the common law of England, (which was against slavery,) and from any common law of the colony, which could only acquire the force of law by *immemorial usage.*

It is clear, therefore, upon the statutes, as it is in reason and universal law, that slavery existed here by the *local* or *municipal law* of the State, as firmly protected by it as any other property of a citizen, but still the creature of express law, or of municipal custom, and not of the *common law,* or in virtue of the fanciful theories which have sometimes been urged in its defence. *Jones vs. Vanzandt,* 2 *McLean,* 600 ; *Rankin vs. Lydia,* 2 *A. K. Marshall,* 470 ; *Prigg vs. The Commonwealth of Pennsylvania,* 16 *Peters,* 611.

This action, therefore, instituted to recover damages for an alleged injury to the possession of a slave, is in no degree derived from the principles of the *common law,* but has its only sustenance in Legislative enactments in derogation of the common law, following a custom, which however general in the State and wise in itself, had not *hardened* by time into a *common law* right when the Legislature began to pass laws on the subject.

It is equally clear that the action does not spring from *contract* in any manner, but it is an action sounding *in tort,* having been brought, as expressed in the Code, for "a wrong independent of contract." *Code of Public General Laws, Art.* 75, *sec.* 22, *sub-sec.* 29 ; *Evans' Prac.,* 62.

Such a cause of action is in no respect a " vested right," as contended for by the appellant, which was not affected by the abolishment of slavery ; but having its origin only with the

establisment of the *local law*, it could have no greater vitality than the law itself. *Smith's Commentaries, secs.* 174, 267, 759, 761, 765, 766, 767, 768 *and* 775; 1 *Bouv. Inst., sec.* 95; *B. & O. R. R. vs. Wash. city,* 12 *G. & J.,* 399; *Keller vs.. State,* 12 *Md.,* 322; *Owings vs. State,* 22 *Md.,* 120; *Day vs. Day,* 22 *Md.,* 537; *Smith vs. Thursby,* 28 *Md.,* 244; *Mayor, &c., of Annapolis, vs. The State, ante,* 112; 1861-2, *ch.* 128; *Selectmen vs. Jacob,* 2 *Tyler,* 192; *Fales vs. Mayberry,* 2 *Gallison,* 560; *Reynolds vs. Furlong,* 10 *Md.,* 321; *Baugher, et al. vs. Nelson,* 9 *Gill,* 302; *Chitty on Contracts,* 657, 658; *De Sobry vs. De Laistre,* 2 *H. & J.,* 228; *Constitution of* 1864, *Bill of Rights, Art.* 24, *and Art.* 3, *sec.* 36; *Constitution of* 1861, *Bill of Rights, Art.* 24 *and Art.* 3, *sec.* 37.

The "vested right to sue," depends upon the existence of the subject in respect of which the suit is brought, and when the subject ceases to exist in the view of the law, the right to sue is gone also.

In the embargo cases, and in actions for penalties, the vested right of action is perfect as long as the particular matter in respect of which the action is brought, is recognized as *alive* by the law. But the expiration of the embargo law by limitation of time, and the repeal of the statute under which the penal action is brought, equally destroy any such "vested right" of action.

The title of the property, in an action of *trover*, vests in the defendant upon the payment of the damages recovered. This is a necessary incident to this action, and if it cannot be gratified in this case, the action is not sustainable. The laws of the State have prevented compliance with it, and this furnished a further argument against the plaintiff's right of recovery. 3 *Bouv.,* 691; 3 *Rob. Prac.,* 405-6; *Stirling vs. Garitee,* 22 *Md.,* 474.

ROBINSON, J., delivered the opinion of the Court.

This was an action of *trover*, to recover the value of a negro slave. At the time of the institution of the suit, negro slavery

existed in this State, and the sole question raised by the demurrer is, whether its abolition by the Constitution of 1864, operates as a bar to the plaintiff's recovery.

The radical error, which underlies the argument of the appellee's counsel, is the assumption, that negro slavery, as it existed in this State, was the creature of statutory law. Various acts, it is true, may be found from the earliest period of colonial legislation in which it was recognized and protected, but the statute book will be searched in vain for a law by which it was established or ordained.

The act of 1663, ch. 30, so confidently relied upon in support of this position, so far from establishing slavery in the colony, recognizes, in express terms, its existence at that time, and it is a well known historical fact, that negro slaves were held here many years prior to that date.

We must, therefore, trace its origin, introduction and the peculiar circumstances under which it became identified with the institutions of the colonies, to other sources than statutory law.

Strange as it may seem to some persons of the present day, it is a fact fully established by public history, that at the time when these colonies were planted, negro slavery and the slave trade were not only recognized as lawful, but sanctioned and protected by all of the enlightened commercial nations of Europe. England, France, Spain, and Portugal were the rivals in every market, in which a profit was to be realized from the trade, and the right to buy and sell negro slaves was everywhere admitted.

This opinion, say the Supreme Court, in 19 *Howard*, 407, " was at that time fixed and universal in the civilized portion of the white race. It was regarded as an axiom in morals as in politics, which no one thought of disputing or supposed open to dispute, and men in every grade and position of society, daily and habitually acted upon it in their private pursuits, as well as in matters of public concern, without doubting for a moment the correctness of this opinion."

Especially was it the policy of Great Britain to introduce and encourage it in the colonies, and so late as 1749, 23 *Geo.* II, *ch.* 30, we find an act for extending and improving the trade to Africa, in which Parliament declares it to " be very advantageous to Great Britain, and necessary for supplying the plantations and colonies with a sufficient number of *negroes* at *reasonable* rates."

Negro slavery was thus introduced into the colonies through the policy of the mother country, and with the consent of the colonists. " It became established," says HURD, on the Law of Freedom and Bondage, page 212, " under the common law of the several colonies, which, however, being a local law only, was entirely distinct in its origin and authority, and in its territorial and personal extent from the common law, which was national in those attributes, and which was, in each part of the empire, the common measure of the personal rights of the English-born subject."

The cases, therefore, in which it has been held that actions based upon statute law, fall with the repeal of the law, and the principles upon which they were decided do not apply.

Slavery being established by the municipal law of the State, the question here is, whether its abolition defeats a pending action of *trover* brought by the appellant to recover the value of his slave. Now, we take the general principle to be well settled, that rights vested under the municipal law of a country are not affected by a change or abrogation of the law. The law says Puffendorf may be disannulled, but the rights acquired by virtue of it, while in force, must still remain. Such a rule, it must be admitted, is founded in reason, and consonant with the fundamental principles of natural justice.

But it is insisted, that the right of action, being merely the remedy, is not a vested right within the meaning of the rule. It is true, a distinction has been recognized between the obligation of a contract and the remedy for its enforcement. It has been repeatedly held, that the remedy may be modified— one form of action substituted for another—the mode and

manner of procedure varied, but a remedy in some shape or form must be left to the person who has suffered in his person or property. All remedy cannot be taken away, for of what value would be the right of property without process of law to protect it? Accordingly, we find it laid down by a late writer on constitutional limitations, " that a *vested right of action,* is *property* in the same sense in which tangible things are property, and is equally protected against arbitrary interference." *Cooley's Const. Limit.,* 362.

In the case before us when the appellee converted to his use the property of the appellant, his liability in an action of *trover,* was fixed under the existing laws of the State. It was not, as was supposed, an *inchoate,* but a perfect and vested right, which, upon the death of the party, survived to the personal representatives.

To deprive the plaintiff of this right,—to impose upon him the costs of a suit brought under the sanction of the law, and then to say no vested right had been disturbed, would indeed be an alarming subversion of principle.

It would be extending this opinion to an unnecessary length, to review in detail the many authorities relied upon by the counsel for the appellee. It is sufficient to say, that upon examination they will be found to be cases, arising upon penal statutes, where it was held, that the action was defeated by the repeal of the law ; *or,* where a statute conferring an executory right was repealed before the right became executed ; *or,* where it was held that the remedy, procedure, and even the statute of limitation may be changed or modified, without impairing the right of action, or the obligation of the contract. But no case can be found, in which it has been held, that a right of action founded upon the municipal law of a country is defeated by change or abrogation of the law.

Apart from this view, it is a sound rule of construction, founded in the wisdom of the common law, that whenever a statute is susceptible without doing violence to its *express* terms, of being understood either *prospectively* or *retrospec-*

*tively*, Courts of justice invariably adopted the former construction. A statute ought not to have a retroactive operation, unless its words are so clear, strong and imperative, that no other meaning can be annexed to them, or unless the intention of the Legislature could not be otherwise satisfied; and especially ought this rule to be adhered to, when such a construction would alter the pre-existing situation of parties, or would affect or interfere with their antecedent rights.

The sole purpose in adopting the constitutional provision now under consideration, so far as we can ascertain that purpose from the express terms of the instrument, or from the history of the times, or the debates in the convention, was the abolition of slavery. That object being accomplished, there is no reason why we should adopt a construction by implication, *retroactive* in its operation, and which defeats rights vested under existing laws. "*Nova constitutio futuris formam imponere debet non præteritis,*" is a maxim as ancient as the law itself.

For these reasons the judgment of the Court upon the demurrer will be overruled, and a *procedendo* awarded.

*Judgment reversed and procedendo awarded.*

(Decided 14th May, 1869.)