The Case is stated in the opinion of the Court delivered by
Mr. Justice Hagnek.
The case is heard here in the first instance upon certificate from the special term in equity. The bill filed by the National Metropolitan Bank of Washington against John Hitz, Jane C. Hitz, William Gl. Metzerott, and Samuel Cross, avers that the complainant corporation on the 28th of April, 1879, obtained a judgment on the law side of the court against the defendant, John Hitz, for $10,000, with interest from October, 1878; that on the 5th of June, 1879, a writ of fieri facias was issued on the judgment and returned on the same day by the marshal nulla bona; that on the next day another execution was issued upon the judgment and levied by the marshal on the estate and interest of John Hitz, in the lands referred to in the bill; that Jane C. Hitz is the wife of the defendant John Hitz; that they were married many years ago, and have lawful issue capable of inheriting the landed estate of the mother; that she is seized in fee of several parcels of land in the city of Washington, described in the bill; that John Hitz is entitled to “a life estate in said lands and tenements herein last described, during the joint lives of himself and his wife,” and by reason thereof is entitled to have and collect and receive all the rents, issues and profits of the said estate; and that the said estate of John TIitz is subject to execution at law; that the said Jane, so being seized of the said lands, and the said John having said estate therein, the said parties by deed of the 9th of December, 1878, conveyed the same *113 to the defendants Metzerott and Cross in trust for the sole, separate and exclusive use and benefit of the said Jane C. Hitz for and during the term of her natural life, free from the control of her husband or from any liability for his debts and with power of disposal thereof; and upon the death of the said Jane Hitz without having made such disposition, to hold the same for the benefit of her children — as appears by the deed which is exhibited with the bill.
It further charges that this deed, although bearing date on the 9th of December, 1878, was not received for record in the office of the register of deeds until the 13th of May, 1879; that the complainant by virtue of the said judgment has acquired a specific lien upon the interest of John Hitz in the property; but that the execution of the.said deed of trust prevents a sale, under the levy, of the said interest and estate of John Hitz at a fair valuation.
It further states, upon information and belief, that Metzer-ott and Cross never accepted said trust; that the said deed, after its execution, was placed in the hands of Metzerott to be held by him in escrow until certain transactions between John Hitz and the German American Bank should be closed; that it was afterwards obtained by the said Jane Hitz from Metzerott merely for safe-keeping, and was improperly and fraudulently filed for record without the knowledge, privity, or consent of the said Metzerott or Cross, the conditions on which it was to have been delivered and recorded never having happened or been complied with, and the complainant files as an exhibit a copy of an instrument of writing called a caveat, executed by Metzerott- and Cross, recorded in May, 1879, stating the foregoing facts and declaring that they had not accepted the trusts contained in the said deed. The complainant charges that, for these reasons the deed of trust is fraudulent and void as against the complainant, and ought to be removed out of the way in order that the complainant, by a sale under the execution, may obtain a full price for the estate and interest of said John Hitz in the premises aforesaid so levied on; and that until the sale of the said estate and interest of Hitz, the complainant is *114 entitled, to have the rents, issues and profits collected and held subject to the further order of the court, as otherwise they will be wasted and utterly lost to the complainant. 'Whereupon the complainant prays that the said conveyance may be set aside and declared null and void as to the complainant; that a receiver may be appointed to collect the rents, issues and profits of the premises, and hold the same subject to the further order of the court; and that the complainant may have further relief.
The answer of the defendant Metzerott substantially admits the averments of the bill as to the trustee.
Mrs. Iiitz answers separately. She states upon information and belief that the promissory note upon which the judgment was obtained against her husband was also executed by certain Mattingly, Donaldson and Prentiss, who are equally liable with John Iiitz upon the same; that judgment was obtained against the said parties which was afterwards stricken out, and the action as to them remains open on the dockets of the court; that some of said parties have interposed as defenses to the suit against themselves, that the complainant received at the time of discounting the note certain collaterals which have not been properly applied, and she claims to be entitled to the benefit of whatever defenses may property be made by any of the parties to the note. She admits that she was married to John Hitz in August, 1856; that children have been born of the marriage who are now living; that she is the sole heir at law of Michael Shanks, who died intestate in May, 1864, leaving a widow and this defendant, his daughter; that at the time of his death said Shanks was the owner of a large fortune in realty and personalty; that the personalty has in great part been wasted by her husband; that upon discovering this fact about the 1st of November, 1878, she assumed exclusive control over all her property, and that her husband relinquished all control over it, and ceased from that time to interfere, directly or indirectly, with the conduct or management of her estate, or any part thereof.”
She further says that, in order to remedy in part the wrongs *115 that have been inflicted, upon her through the misappropriations and the mismanagement of her property and estate by the said John Hitz, the said deed of trust to the said'. Metzerott and Cross, of the 9th of December, 1878, was made,, acknowledged, delivered, and recorded. She denies that the-said deed was voluntary and without consideration, or with, intent to hinder, delay, or defraud the complainant or anybody else ; and she denies that her husband has any interest in said lands -which can be taken in execution under the-judgment. She also denies the charges as to. the circumstances connected with the delivery of the deed to Metzerott.
The answer of the husband substantially raises the s£tm& defenses.
The testimony of Mr. and Mrs. Hitz, and of Metzerott and Cross, and of Keyser, the receiver of the German-American National Bank, was taken under a commission. Most of the questions of law discussed before us are really elementary in their character, and might well have been disposed of with a bare statement of the law without any attempt at elaboration, but the case has been argued with such great care and earnestness upon the part of the defendant’s counsel that I have considered it proper to state the reasons for our conclusions somewhat at length.
1. The first question to be determined is, what estate did John Hitz acquire in the real property which, after the birth of issue alive, descended to his wife as the sole heir-at-law, upon the death of her father in 1864 ?
This question admits of but one answer. By the uniform declaration of every authorized exponent of the law, from its earliest ages to the present time, it is incontestibly settled that, by the common law, the husband, from the m.oment of his marriage, became entitled by virtue of his marital rights to an estate in the lands of inheritance of his wife during their joint lives; that immediately upon the birth of a living child capable of inheriting the lands, the husband became entitled to an estate in all the lands of which she might be seized at any time during the coverture for the term of his own life; that this estate of the husband during *116 the life of the wife, which was known as tenancy by the cur-tesy initiate, upon the death of the wife, was called tenancy by the curtesy consummate, and that the tenancy by the curtesy initiate was one of the forms of estates known as freeholds, not of inheritance, which was created by construction and operation of law. 1 Coke Litt., section 35, 29 a.; 2 Kent’s Com., 140 ; 4 Kent’s Com., 27; 1 Roper “ Husband and Wife,” 3, 5.
It is further settled beyond, controversy that the husband was seized of this freehold as of his own right; that although his title was not consummate until the death of the wife he might, during her life, do many acts to charge the lands. 2 Black. Com., 120 ; 1 Washburne Beal Property, 128. That as such he became the tenant of the lord and did homage alone ; and if, after issue, he made a feoffment in fee and the wife died, the feoffee would hold during the life of the husband, and the heir of the wife could not, during the husband’s life, recover 'the land. 1 Coke Litt., 558. That he might sell and convey his estate or mortgage it to a creditor. Central Bank vs. Copeland, 18 Maryland, 320; Babb vs. Paley, 1 Maine, 9; and that this interest would pass to his assignee in. insolvency, who could sell and convey to the purchasers a valid title for the life of the husband. Dejarnette vs. Allen, 5 Grattan.
These common-law principles were undoubtedly in force in the District of Columbia at the time of the death of Michael Shanks, as they were the law in Maryland on the 29th of February, 1801, and no intervening acts of Congress had changed or modified their operation within the District of Columbia. Anderson vs. Tydings, 8 Maryland, 443; Logan vs. McGill, 8 Maryland, 420; Rice vs. Hoffman, 35 Maryland, 350.
2. The next inquiry is, was this estate of John Hitz such an interest as might be seized and sold under execution at common law for the payment of his debts ?
The answer to this, upon all the authorities, must again be in the affirmative.
Says Chacellor Kent : “The husband has an interest in *117 the freehold estates of his wife, which may be seized and sold on execution ; and if the assignee or creditor of the husband, who takes possession of the estate on a sale on execution of his freehold interest, commits waste, the wife has an action against him in which the husband must join ; for though such assignee succeed to the husband’s rights to the rents and profits, he cannot commit waste with impunity,’’ See also Dejarnette vs. Allen, 5 Grattan.
The effect of a levy and sale of the husband’s interest is the same as that of a conveyance by him which would pass the freehold leaving the reversion in his wife. 1 Maine, 6; 18 Pick., 23; 2 Kent, 131; see also the numerous cases cited in Herman on Executions, 134. This doctrine has been repeatedly asserted, toiidem verbis, by the courts of Maryland Anderson vs. Tydings, 8 Maryland, 427, Logan vs. McGill, 8 Maryland, 470.
The legislature of that State, to abate the hardship of the possible ejection of the wife under such a sale from her own inherited landed estate, passed the statute of 1841, ch. 161 ; and in reference to the state of the law as thereafter existing, the court says, in Rice vs. Hoffman, 35 Maryland, 344: “This interest of the husband (his curtesy initiate) was liable to be taken in execution and sold at any time for his debts until the act of 1841, ch. 161, which provided Ghat no real estate hereafter acquired by marriage shall be liable to execution during the life of the wife for debts of the husband.’ The effect of this act was not to destroy the tenancy by the curtesy, but to suspend the right of execution on the part of the husband’s creditors during the life of the wife.”
3. There is no such statute in force here postponing the right to sell under an execution levied upon the curtesy interest of the husband. But it is insisted upon behalf of Mrs. Hitz that the act of Congress of the 10th of April, 1869, took away all rights of the husband in the real estate of his wife, and exempted it from all responsibility for his debts as well in the past as for the future.
Is this contention well founded, is the next inquiry?
This real estate, as we have seen, descended to Mrs. Hitz *118 in .1864, after tbe marriage and birth of children alive, and whatever were the husband’s rights under the existing law? they were unquestionably, vested in him before 1869, when this statute was passed.
These rights could be destroyed by the act of 1869 only upon the theory, 1st, that the statute is to be construed retroactively, and, 2d, that if this construction is to be given to it, it was competent for Congress to pass a law destroying the'vested rights of John Hitz as tenant by the curtesy initiate, and transfer them to his wife, and thus remove them beyond the execution of the complainants.
In our opinion, neither of these propositions is maintainable.
The act as codified in section 727 of the Bevised Statutes of the District of Columbia, is in these words: “In the District the right of any married woman to any property, personal or real, belonging to her at the time of marriage, or acquired during marriage in any other way than by gift or conveyance from her husband shall be as absolute as if she were not married, and shall not be subject to the disposal of her husband nor be liable for his debts.”
The language of the section is peculiar. It is elliptical in form, for according to its literal phraseology it is “ the right of any married woman to any property” which “shall not be subject to the disposal of her husband, nor be liable for his debts;” and not the property itself. But assuming that this peculiar phraseology does not affect its meaning, it seems, to be plain that no assertion to the contrary can be sustained, that the lawmaking power did not in words declare that the statute should be retroactive in any of its features, and if such an interpretation is to be given to it it can only be effected by judicial construction. It is manifest that all the other provisions of the statute which are incorporated in the three following sections, viz.: the power given the wife to convey or devise her property as a feme sole — to contract and sue, and be sued in her own name — and the right of the creditor to enforce the collection of judgments recovered against her by execution against her separate estate, are all of prospective operation merely. To construe *119 this portion of the law retrospectively, therefore, would be inconsistent with the manifest import of the residue of the statute 5 and some strong reason should be shown for adopting such a construction. The wholesome principles controlling -courts in their construction of statutes in this particular are well expressed in Williams vs. Johnson, 30 Md., 507: /‘It is -a sound rule of construction, founded on the wisdom of -the common law, that whenever a statute is susceptible, without doing violence to its express terms, of being understood either prospectively or retrospectively, courts of justice invariably adopt the former construction. A statute ought not to have a retroactive operation, unless its words are so ■clear, strong aud imperative that no other meaning can be annexed to them, or unless the intention of the legislature ■could not be otherwise satisfied. And especially ought this rule to be adhered to when such a construction would alter ■the pre-existing situation of parties, or would affect, or interfere with their antecedent rights.”
It cannot be said that the retrospective construction contended for is the only one “ that can be annexed to the words.” On the contrary, the construction 'naturally arising -out of the plain import of the language, less in derogation with the then existing law, and producing none of the injurious effects upon the situation of parties, so deprecated by the courts, is that which would hold that the statute applies only to the case of persons who should thereafter marry, and has no operation upon the circumstances of those who may have been married before the passage of the law. If the statute should be construed retrospectively it is diffi■cult to see where its embarrassing effects would cease.
The first obvious result would have been to divest the -estate of every husband then within the District of Columbia, in whom at that time a tenancy by the curtesy was vested. Such an interest might have been the property of the possessor for half a century; the sole support of an aged man who, while in prosperity, might have spent his substance in promoting his wife’s comfort, and whose generosity may have placed in her the title to the land. Without warning, *120 by this construction of the law, he would be turned out of his possession and compelled to surrender it to others, perhaps entire strangers to him.
Again, if the property of the wife, thenceforth, was literally no longer to be liable for the debts of the husband, might it not be equally well contended that the joint mortgages or deeds of trust of husband and wife given to secure his debts would in like manner be discharged ? The husband’s curtesy interest, before the date of the act, could be mortgaged to pay his debts. If his estate was confiscated by the statute, would the mortgage upon this confiscated interest remain in force?
If Congress had designed the adoption of a policy productive of such grave consequences, is it not reasonable to suppose it would at least have made use of language demonstrating, by the introduction of a few words, that the law was intended to apply to cases where marriages had been contracted before the enactment of the law as well as to those to be contracted afterwards.
In the case of Herbert vs. Gray, 40 Md., 530, it was decided that the act of 1872 which provided “ that a married woman may be sued jointly with her husband, on any note, &c., which she may have executed jointly with her husband,”' applied only to such instruments executed after the passage of the act. The court pointed out that the language of the law was not “ which she may heretofore have executed,” but the words, “ which she may have executed,” must according tO' the settled canons of construction, be taken to apply to the time of beginning the suit, and not of the passage of the law. The headnote to the case of De Hart vs. Dean, 2 Mac Arthur, 60, distinctly states that the General Term there held that this provision of the statute should receive only a. prospective construction. This particular expression does-not appear in either of the opinions in that case, or we should have been content to rest our decision upon that case alone. But we are well satisfied that the syllabus of the case announces the proper construction of the act. Such, too, appears to be the view of the Supreme Court of the United *121 States as to this statute, as expressed in the case of Sykes vs. Chadwick, 18 Wallace, 148, -where the Court say: “The sole object of the statute w7as to prevent the husband from acquiring such an interest in his wife’s property.” But if the words ,of the statute could reasonably be construed to bear this interpretation, we are of opinion .that such a provision would have been beyond the Constitutional power of Congress. Its effect would have be.en a general confiscation of the vested rights of property in every man holding as tenant by the curtesy within the Distinct of Columbia, by a mere Congressional edict, in the face of the Congressional provision which declares that Congress shall not deprive a citizen of life, liberty or property without due process of law, which, according to Lord Coke, means the old law of the land. The general principle that a statute which attempts to confiscate the property of a citizen, or surrender it to another, without trial or judgment, is rather a sentence than a law, and is as entirely at variance with the first principles of natural justice and of the social compact as with inhibitions of the Constitution, is, of course, too firmly fixed to need enforcement by authority. But a multitude of well-considered cases show that the principle has been applied by the courts to special laws attempting to interfere with the vested rights of the husband in his wife’s land. Its application is very clearly vindicated in the case of Rose vs. Sanderson, 38 Ill., 243. The legislature of that State enacted a law which declared that all property, both real and personal, belonging to any married woman as her sole and separate property, &c., shall, notwithstanding her cover-ture, be and remain, during coverture, her sole and separate estate under her sole control, &c., and not be subject to the disposal or interference of her husband, and be exempt from execution for his debts. The Court says :
“ Can a life estate once vested in the husband, be possibly considered as coming under the description of property belonging to any married woman as her sole and separate property? That is to say, can the property of one person be justly described as ‘ belonging to ’ another? This would be *122 simply a contradiction in terms. Yet when this law was passed, the property in controversy, to wit, the life estate of the husband levied on, was as completely his as if his wife, before he married, had owned it and conveyed it to him for a valuable consideration.”
See, among many authorities, 2 Bishop on Bights of Married Women, Sec. 43; Westervelt vs. Gray, 12 N. Y., 212.
Indeed, there can be found no statement to the contrary in any text-book of authority, and we have been referred only to a solitary case clearly in opposition to this uniform course of decision — that of Ruyh vs. Ottenheimer, 6 Oregon, 231. There can be no question that this decision is directly in opposition to the doctrine here announced, and the court, in its opinion, admits that such is the case, and bases its judgment upon the peculiar circumstances attending the settlement of that country. The court refers to the prevailing custom when patents were issued to settlers, to enter one-half the band in the name of the wife ; and declares that this recognition of an equal right of the wife in her property was interwoven with the texture of society in that community. They further say the constitution was made by rough settlers who had been accustomed to recognize this well-nigh universal tenure of the lands in the Territory, and who must have understood that the language they thus introduced in their constitution was to affect all lands in the State, whenever acquired. It may be that this judgment may be maintained for the future as an authority in Oregon, but we can hardly suppose it could be taken as in force in any other community in the country, and it.would be inexcusable in a community like this in Avhich we live, to depart from the well-ascertained landmarks of the law in deference to any such novel ruling, confessedly founded upon peculiar conditions of society existing only in the jurisdiction where the opinion was announced. The ease stands as a legal Melchisedek, without pedigree or descendant.
We are referred in the brief of the counsel of Mrs. Hitz, to the act of Congress of 19th June, 1860, which declares *123 that the power was thereby conferred upon the courts of the District in all cases where a divorce is granted, “to award to the wife such property, or the value thereof, as she had when she was married, or such part,” &c., “ as the court may ■deem reasonable;” and it was insisted that if Congress possessed the power to pass a law granting such power to a •court, it must equally possess the authority to divest the husband’s title, without the intervention of a court. It would be sufficient to remark that no such power can now-be claimed to reside in the courts of -the District, as the provision in question was studiously excluded from the Devised Statutes of the District of Columbia, although •every other sentence of the act of 1860 on the subject of divorce is carefully retained; and this would seem to afford strong evidence of legislative construction of -the impolicy, if not of the unconstitutionality of the provision in question. But if the provisions were still in force, the question 'would remain, whether it was designed to affect property acquired under antecedent marriages, and its construction, therefore, would present a second case fox interpretation more obscure than that under examination — ignotum per ignotius illustrare.
In so far as the original statute professed to recognise any power in the courts to make such provision in cases of divorces a mensa et ihoro, it was clearly without the sanction of the recognised principle attending divorces a vinculo, as was declared in the case of Stephens vs. Tolly, Croke Eliz., 908.
In Greenly’s case, 8 Coke, 72, it was decided upon the proper construction of the 32d Henry VIII, ch. 25, that where a husband aliens and is afterward divorced causa pre-contracts, or for any other cause that dissolves the-marriage, a vinculo, the wife’s rights are reinstated and she may enter. But this is upon the express ground that the sole basis of the husband’s right is the marriage; that his right exists only in privity, and on a divorce, which totally dissolve the marriage ab initio, all privity between them is at an end, and he has no more claim than any other stranger to intermeddle with her estate. Cooley’s Const. Lim., 285; Wright vs. Wright, 2 Md.
*124 Cases were also cited to show that legislatures have passed laws modifying the existing provisions respecting dower, which have been sustained by the courts, as implying a similar power with respect to curtesy interests. But the distinction between the two cases is quite plain, and is well explained in Cooley’s Constitutional Limitations, p. 361. The potential right of dower during the life of the husband is a mere expectancy which may never be realized or possess an actual existence. Until it is vested, after the husband’s death, and perhaps not until it has been actually assigned, it cannot be considered as an estate at all, and there can be no pretence of vested rights in connection with it. "Whereas with respect to tenancy by the curtesy initiate, we have seen it occupies the position of all other vested estates, and is- entitled to the same immunity from confiscation without due process of law.
After the widow’s right of dower has been vested in her, the legislature could no more deprive her of it by statute than they could condemn her to death without accusation or hearing.
It is clear, therefore, in our opinion, that the married woman’s act does not interfere with the judgment.
4. But it is insisted upon the part of Mrs. Hitz that the lien never existed, because before the recovery of the judgment Hitz and his wife had united in a conveyance of their entire interest in the land to Metzerott and Cross, as trustees.
If this deed is operative from its date, of course this contention is correct. But it is replied that although the execution of the deed of trust preceded the recovery of the judgment, yet as it was not recorded until after the entry of the judgment, the judgment must prevail over it; and, this objection is based upon the provisions of the statute of 27th April, 1878, which is in these following words :
“All deeds, deeds of trust, mortgages, &e., and any instrument of writing which by law is entitled to be recorded in the office, &c., shall take effect and be valid as to creditors and as to subsequent purchasers for valuable consideration without notice, from the time tohen such deed, deed of trust, *125 ¿•c., shall, after having been acknowledged, approved, or certified, as the case may be, be delivered to the recorder of deeds for record, and from that time only ; and the recorder of deeds shall note on each deed, &c., the day and hour when the same shall be received.”
This statute repealed the antecedent laws limiting the time for the recording of certain deeds, and it would be competent now to withhold a deed of trust from the record for years without invalidating its effect, provided the rights of creditors, or purchasers without notice, are not affected thei’eby.
The words of the statute are perfectly plain. Every such deed as that under examination shall take effect and be valid from the time it shall be delivered to the recorder of deeds for record, and from that time only. The time of record of this deed was May 13, 1879, and by the explicit declaration of the statute, from that time only can it be of effect or valid against creditors without notice. Two decisons of the Supreme Court of the United States may be cited as showing the views entertained by that court as to the effect of similar provisions in State statutes.
In McCoy vs. Rhodes, 11 Howard, 140, it appeared that McCoy recovered a judgment against Rhodes on the 24th of February, 1840, and it was insisted that this judgment should not prevail as a lieu against a deed executed by Rhodes on the 7th of December, 1839, which was not recorded until the 10th of December, 1841, after the rendition of the judgment. The court says : “ According to the statute law of Louisiana no notarial act concerning immovable property has effect against third persons until the same shall have been recorded in the office of the judge of the parish where such property is situated. In relation to third persons the act of sale not recorded is considered as void. The deed being a notarial act took effect the 10th of December, 1841, against the judgment creditor, and as the lien of the judgment attached the 24th of February, 1840, when the title was in Rhodes, the debtor, this deed is of no force against the judgment, nor are the subsequent deeds founded upon it.”
*126 In Taylor vs. Doe, 13 Howard, 293, the. court, in construing the statute of Mississippi upon the subject of the recording of deeds, which is in these words: “Deeds of trust, &c., are valid as against purchaser’s only from the period at which they are delivered to the proper recording officer.” Held, That a trust deed dated 21st of September? 1840, recorded 7th of December, 1840, must by the operation of the registry statutes be inevitably postponed to the rights of the claimant under a judgment recovered on the 17th of November in the same year. Indeed, any other construction of such provisions would, in the uniform language of the courts, fritter away the registry laws and render them wholly nugatory as to creditors ; for, as between the parties, the deeds were good without recording.
There is no pretense that this complainant had notice of the execution of this deed of trust before it was admitted to record. Indeed, it appears clearly in proof that it was not intended it should be placed upon the record until Hitz’s indebtedness to the German-American Bank should be adjusted ; and this condition would certainly have postponed the recording beyond the time when it was actually admitted to record. The deed was withheld from the record by the express advice of Mrs. Hitz’s counsel for the purpose of preventing notice of it's execution, with a view to allaying excitement among the creditors of the broken bank. The possible injury to Hitz’s creditors which might result from giving the deed efficacy from its date against intervening creditors must be apparent. By withholding it from the record, persons advised by their counsel that Hitz was seized of a valuable interest in his wife’s land which would be liable for his debts, might have been induced to grant or extend to him credit, and thus incur the loss of their debts upon the production five months or five years afterwards of a secret deed withheld from the records for the purpose of lulling them into a false security.
It is unnecessary to examine in detail the other objections taken by the complainants to the validity of the deed of trust to Metzerott and Cross. Admitting that those trustees *127 had not accepted the trust actually or by implication, in such wise that their disclaimer, recorded after the registry of the deed, would be effectual to discharge them from the trust,, still this court would not hesitate to sustain the trust in favor of the benficiaries, if otherwise valid, and would proceed on application, or of its own motion if necessary, to the appointment of suitable persons in the place of the disclaiming trustees.
5. It is further insisted upon the part of the wife that notwithstanding the irregularities in the registry of the deed, the judgment created no lien upon the curtesy interest of Hitz, because by his words and acts he had previously disclaimed all interest in the real estate of his wife ; that the deed of December 9th, 1878, was but a mere formal expression of his antecedent purpose, and that the deed, though unrecorded, should be sustained as an effective settlement by the husband upon the wife upon valuable consideration.
The statements concerning the supposed disclaimer are to be found in the answer of Hitz, pages 17 and 19, in these words : “ He further says that on or about the 1st of November, 1878, he ceased to have anything to do directly, or indirectly, either as the agent of Mrs. Hitz, or otherwise, with the real estate or personal property belonging to the said Jane Hitz, by her inherited from her father, and that he has not since that time in any wise interfered with the same; and he further says, that he never has asserted and has never known or believed that he had any control over, ownership of, or estate in, any of the property inherited by his said wife, Jane C. Hitz, by virtue of his marital relations and does not seek now to do so.” Again: “ And this defendant does not now assert, and never has asserted any title in him in or to the said premises, and that he does not now claim any title or interest thereto or therein. He further says that the truth is that he never had anything to do with the title of Jane C. Hitz, except as her agent, and that separate accounts of the income thereof have always been kept, thus treating the property as her separate estate *128 coming from the estate of M. Shanks, deceased.” In Mrs. Hitz’s answer, page 14 of the record, she states, “ that on or about the 1st of November, 1878, she assumed exclusive control over all her property, and that the said John Hitz thereupon relinquished all control over it, and ceased from that time to interfere directly or indirectly with the management or conduct of her estate, or any part thereof, &c.”
John Hitz, in his testimony, page 55, says : “ I treated this as separate property always. * * * I always looked upon myself as her agent and had the right by courtesy to control it, and so long as she made no interference.” And again, he states, that, at the time the deed was made, or the 9th of December, 1878, he controlled the property, but surrendered possession of it to her in November, 18 78. In question 151 he is asked: “Did she say anything about getting rid of your controlling interest in the property ; such as you might have had or might assert by virtue of being her husband. (A.) I do not remember anything of the kind if she did. There may have been something. I had my own ideas about that at the time. (Q.) What were they? (A.) I never claimed any controlling rights, then or previous thereto, to the title of the property. The income went by courtesy as long as she did not object to my collecting it.”
Mrs. Hitz, in her testimony, states that after her father’s death the estate was managed by Mr. Hitz ,- that she took very little part in its management; that Hitz collected the rents, and that in November, 1878, she resumed possession and control of the property personally, and Hitz then turned it over to her, and that since that time the rents have been collected by her agent, Sherman.
We fail to see in this testimony, especially when taken in connection with the other proof, anything which could in law be taken as sufficient evidence of a purpose upon the part of Hitz before the execution of the deed of trust to disclaim or abandon his rights in the real estate as husband. But the authorities agree that if he had entertained such purpose, it could not have been legally effected by disclaimer, even in writing. As the result of the authorities, *129 it is stated in 1st Washburne on Real Property (128): “And this right initiate, as well as the estate consummate, is liable to be taken for his debts, nor can he defeat the right by any disclaimer of his right of curtesy.” Among ■other cases in which this doctrine was examined, is that of Watson vs. Watson, 13 Conn., 83; in which a surviving husband sued in ejectment to recover possession from her children of lands left by his deceased wife. The children offered in evidence a written paper under seal, executed and acknowledged by the husband after the death of his wife, and duly recorded, in which he disclaimed all pretense of right or claim to the lands as against all persons, and especially as against the children. Upon the part of the husband this paper was objected to as inadmissible, and the objection was sustained. The court says: “The object of a disclaimer is to prevent an estate passing from a grantor to a grantee before title vested, but if the grantee once assents and title is thereby vested in him, he cannot by any subsequent disclaimer revest the title in the grantor. This would be to make a disclaimer a deed, which it is not, the object of a deed being to transfer property, and of a disclaimer to prevent the transfer. An heir cannot by disclaimer prevent a title from vesting in him; it vests immediately upon the death of the ancestor. He cannot by disclaimer cause the estate to remain in the dead ancestor. Nor can he by disclaimer transfer the estate to any other person as heir of the ancestor. A grantee before consent can disclaim, and so can a devisee who takes by grant, to which assent is requisite. Hoes tenant by the curtesy stand as heir or as purchaser? It is an estate thrown upon the tenant by the curtesy by operation of law. It partakes rather of the character of an estate acquired by descent. Like the heir, he cannot, by refusing to take it, cause it to remain in the wife, nor can he by disclaimer transfer it to others. The estate thus vested in him becomes immediately liable for his debts, and he cannot, by any refusal to take the property, defeat the claims of his creditors.”
*130 The unrecorded deed then derives no validity from the supposed disclaimer of title by acts in pais.
6. But it is further insisted upon the part of Mrs. Hitz, that the deed to Metzerott and Cross was not voluntary and fraudulent as, to creditors, but was founded upon valuable and meritorious considerations which will prevail even against a judgment recovered before the record of the deed. And the attempt is made to assimilate the present to those cases in which bona fide sales with payment of the consideration, but without conveyance, are allowed over a subsequént judgment against the vendor still holding the legal title.
The consideration named in the deed of trust is one dollar, and it is attempted to show against the objection of the complainant that it was executed in fact upon very different inducements. It is settled that it is not permissible to show that the real consideration was different in kind from that mentioned in the deed. Thus in the case of Sewell vs. Baxter, 3d Md. Chancery Decisions, 454, the chancellor said: “The deed upon its face is voluntary, the nominal consideration of $5 mentioned in it being introduced simply to give it the character of a bargain and sale.” And he proceeds to declare that it is not competent for the grantee to show by parol that it was not a voluntary settlement by her father upon her, but that the land was purchased and paid for by her father with her money.
The admission of such evidence would be doubly dangerous where, as in the present case, it consists of the testimony of the grantors in the deed, the husband and wife, endeavoring to change and contradict its averments in the interest of their own equitable grantee, the wife herself. Unless we are to suppose that the furnace of financial affliction would consume away the innate dross of human nature, the creditors or others outside of the benefits created by the deed might as well despair of any result at variance with the present wishes of the witnesses who are at once the grantors and the grantee.
On the other hand it is, of course, admissible to show that the true consideration was different in amount from that *131 mentioned, provided it be not different in kind. But “ where the deed purports to be upon a money consideration, it cannot be shown that money did not constitute the consideration, or if voluntary, or on consideration of marriage or the like, it cannot be shown that the consideration was a moneyed one.” Mayfield vs. Gilman, 31 Md., 240.
The admissibility, therefore, of such .evidence must be tested by the principle just mentioned.
Mrs. Hitz, one of the grantors and the equitable grantee,, in her answer, in reply to the charges of the bill that the conveyance was voluntary and fraudulent against the complainant and others, says, that having discovered that the greater portion of her inheritance had been lost or appropriated by John Hitz, she assumed exclusive control over her proparty about the 1st of November, 1878, and that in order to remedy in part the wrong so inflicted upon her through the misappropriations and mismanagement of her property by her husband, the said deed of trust was made and executed.
John Hitz, the other grantor, in his answer, says that his wife, at his request, joined in the conveyance in fee simple to Mattingly and Prentiss of certain other valuable property, previously conveyed by him to Hatch, in consideration and upon condition that he would execute in due form of law the conveyance to Metzerott and Cross. And that she also conveyed her dower right in such property as stood in the name of John Hitz to Benjamin TJ. Keyser, at the urgent request of the defendant, John Hitz, to secure the payment of any balance that might be found due to the bank; and he also averred “that other and more valuable considerations for the executions of the said deed existed at the time.”
Metzerott, one of the grantees, declared that the deed was delivered as an escrow to be held and not delivered to Mrs. Hitz until all the transactions of Hitz with the German Bank had been settled, and that it was placed on record by Mrs. Hitz in breach of her agreement with the trustees.
The evidence of Mrs. Hitz states that she was not satisfied with the way in which her property had been managed, and that she made it a condition of her writing in the deed to *132 Keyser (meaning to Mattingly and Prentiss) of the New York House, that the residue of her estate should be conveyed to trustees. She is asked : “Will you state upon what other considerations in addition to this New York House this conveyance was made to you, as you understand it?” She states in reply : “ Well, 'I don’t know what other consideration there was. (Q). There was no other consideration than the exchange of the New York House — your deed of that? (A). That was all.”
John Hitz, on his examination, when asked to state upon what consideration and under what circumstances that conveyance was made, replies : “The consideration was an obligation on her part that she would sign a conveyance of the property on Pennsylvania avenue, corner Jackson Hall Alley.”
Metzerott, in his testimony, says Mr. W alter Cox was at that time Mrs. Hitz’s counsel, and Mrs. Hitz told me she asked Mr. Cox what, after Mr. Hitz’s debts were all paid, and if anything was left of her property, could be done to protect that so that it could not be touched at any future day for the debts which he might create. She stated that Mr. Cox advised her that she should get him to execute such a deed in her favor to a trustee, or to two trustees, friends of hers, and she asked me whether I would consent to act as such. This occurred in my store a short time after the failure of the German American Bank and before the deed was made. I told her of course it was understood that that paper was not to go on record until all matters were settled, and she said that Mr. Cox told her that the paper would not go on record until all present claims against Mr. Hitz had been settled up. That was before the paper was executed. That he then went to Mr. Cox’s house with her, and Mr. Cox then said that that paper would have no effect and would create a very bad impression if it was placed on record, that it could not be of any effect, but that it was an excellent thing for the future.”
The dates of the deeds are important, the deed of trust to Metzerott and Cross bearing date of the 9th of December, *133 1878, and that to Keyser of potential right of her dower in her husband’s land was executed 2d of November, 1878 ; and that to Mattingly and Prentiss of the New York House of the property previously conveyed by her husband to Hatch, bears date 18th December, 1878 ; no two of the deeds were executed contemporaneously.
Upon a careful consideration of the whole testimony, we cannot arrive at the conclusion that the evidence sustains the allegation in Mrs. Iiitz’s answer that the deed was given to reimburse her for her husbuand’s former extravagances, or the different assertion in her testimoney that it was given upon no other consideration than that she should contemporaneously execute a deed of the New York House, hor that it sustains the averment in the answer of John Hitz that the consideration was the execution of the hotel deed — the release of her dower in the lands of Hitz and other'valuable considerations. On the contrary we think the effect of the evidence is to sustain the further statement in Hitz’s answer, (page 18) and in his evidence, page 59, and in Metzerott’s evidence; that the purpose of the wife was to save her property from further entanglement by removing it entirely, if possible, from her husband’s control, and from liability for his future debts.
And this is altogether in consonance with the language of the deed itself, prepared by eminent counsel (according to Metzerott’s evidence), at the request of Mrs. Hitz for the protection of her property, thereafter, if the existing debts of her husband should all be paid, from any future indebtedness on his part.
The deed of trust to Metzerott and Cross then was a voluntary settlement by John Hitz of his existing vested interest as tenant by the curtesy initiate, for the benefit of his -wife.
But such a voluntary conveyance from a husband to his wife, so far as the same is in derogation of the rights of subsisting creditors, in the eye of the courts is fraudulent and void. • Hermann on Executions, sec. 134.
It is with no idea that a word of authority can be supposed. *134 necessary in support of so manifest a proposition, that I refer to the case of Vanduzen vs. Vanduzen, 6th Paige Ch., 366, but I quote from the opinion of Chancellor "Walworth because it so well expresses the feelings which have inspired me in the examination of this case.
In that case the bill was filed by a wife against a worthless husband and his creditors for an injunction to prevent a sale under judgments. It charges that the judgments were recovered for money won at cards, though this was denied. The chancellor: “Neither do I think it competent for the wife in such a case as this to impeach the consideration of a judgment recovered against her husband, unless she can also satisfy the court that the judgment is the result of collusion or conspiring between her husband and mere nominal creditors to deprive her and her children of an equitable right to a provision for a support out of her property. There is no doubt that the husband has ruined himself by gaming, and if his interest as tenant by the curtesy in his wife’s real estate is sold on execution upon this judgment, his wife and children will be left without any means of support during his life.
“In the case under consideration, with the strongest desire to protect if possible this unfortunate wife and her helpless children, who are about to be reduced to beggery in consequence of the husband’s improper conduct, aided by his creditors, I have not been able to find any principle either of law or equity which can authorise this court to interfere with the husband’s legal estate as tenant by the curtesy initiate in the wife’s real property, so as to place it beyond his reach and the reach of his creditors.”
7. It is also claimed that this court in the present case should restrain the creditor from realizing his claim by the sale of the husband’s curtesy interest in his wife’s land, until a suitable provision should first be made out of the interest they expect to sell, for the benefit of the wife and her children, in view of the wasteful manner in which the husband has dealt with her estate.
The cases cited in support of this contention refer to the *135 action of courts of chancery in securing what is called the wife’s equity to a reasonable provision out of her estate, but they are not at all applicable to the present case. The wife’s •equity relates only to her right to a provision out of the claims of the husband upon the wife’s property in action. According to Chancellor Kent, Vol. 2, (141), the wife’s equity only attaches upon that part of her personal property in action which the hasband cannot acquire without the assistance of a court of equity. If the husband or his assignee has already reduced the property into possession a court of equity does not interfere.
In Mitchell vs. Lanier, 9 Humphreys, 148, where the wife made this claim against .her husband and his creditors in a case of great hardship, the Court of Appeals of Tennessee says:
“ The wife’s right to an equitable provision out of the estate, against her husband and his creditors, ceases when the husband obtains possessions of the estate. In the case before us the husband has been long in possession, and, as a tenant by the curtesy, is entitled to a life estate therein. Upon the whole we are constrained to say there is no reported case, nor is there any principle recognized by a court of ■chancery by which the relief asked can be sustained.”
In the present proceedings Hitz is not seeking the aid of a court of chancery to obtain possession of his toife’s estate. He had been seized of this vested estate since the death of Michael Shanks in 1864. The complainant is a creditor who was authorized to trust him upon his long possession of this curtesy interest, of fourteen years duration when this note was given. The bank is not here seeking to seize the property of the wife, but to sell the interest of the husband in her lands, belonging to him as firmly under the laws of the country as if his wife and her father had conveyed it to him before the marriage.
8. The circumstance brought to our attention that the credit was not given by the bank to Hitz until after the passage of the act of 1869, and that, therefore, the bank was warned of the purpose of Congress, and should not be *136 allowed to look to this property for payment, is quite immaterial. "What did the act of 1869 advise these creditors? Properly construed, according to the unmistakable canons of interpretation, it clearly told all the world that Iiitz’s curtesy continued to be liable for his debts notwithstanding the passage of that act; and the fact that they trusted him after the passage of the act of 1869, is therefore as powerless to defeat their lien as would be the fact that they had trusted him after the passage of that act upon the faith of property acquired by him by inheritance or by hard labor before their eyes. One of these descriptions of property was just as fully liable for his debt before the passage of the act of 1869 as the others, and they all remained equally liable after the law had passed, wholly unaffected by its-enactment.
9. The counsel for Mrs. Hitz have urged with great, earnestness that on equitable principles this curtesy interest should not be sold until some effective proceedings have been taken by the complainant to collect the debt from the other parties to the note. The'.intimation is made that ■under the existing condition of affairs the husband’s curtesy interest is to be sold to the infinite distress and injury of his wife, while the other parties are to be left undisturbed, and this too in the presence of a claim by them in the suit at law that the complainant has dealt unfairly with them in. not applying certain collaterals which, if properly applied f would be a satisfaction of the judgment in part or in whole.
Apart from'the fact that there is no proof supporting this allegation, it is manifest that the judgment against John Hitz merged the cause of action as to him — that no inquiry can now be made in this proceeding into the consideration or orignal surroundings of the ■ notes, and that if the complainant is to be prevented from collecting the money from either of its debtors until each of the others shall have been equally pressed, the debt will never be made at all. If Mi’s. Hitz shall pay this judgment out of her other property which is unaffected by it and have it assigned to her use, she will be entitled to be reimbursed from each *137 of the other debtors, in the same way that either of them who might pay the judgment could claim reinbursement of his aliquot proportion from the estate of John Hitz.
The hardship of a decision in favor of the complainant has been pressed by the counsel of Mrs. Hitz with great feeling and eloquence. It required no such appeal to inspire our sympathy in her behalf, and this feeling has impelled us to a more careful examination of the whole case with an anxious desire to give to her at this late day, to a limited extent at least, something of the protection which neither her father nor her friends had the forethought to surround her with before her marriage.
By a proper ante-nuptial settlement, almost universal for a century past in England, or by proper conveyance after-wards, before John Hitz became indebted, her property might have been fully protected from the improvidence of her husband, or of herself, as is now the case with the property of all women married within the District of Columbia, since the year 1869, when the statute undertook to make a general provision on the subject. But nothing of the kind was done in this case, and the property was left as it was at the common law. It is not within our power to do otherwise than declare the law as we find it, and this we have attempted to do.
It is a total misconception of the duties of courts of equity to suppose that they should decide upon principles of abstract justice without reference to the controlling effect of the decisions of courts. In the language of an eminent recent writer, Smith’s Equity Jurisprudence, page 3: “In the most general sense, equity is synonymous with natural justice. But equity, as contradistinguished from law, and as administered in our courts of equity, has a much narrower and otherwise different signification. Many matters of natural justice by the equity jurisprudence of this and every other civilized nation, are left to be disposed of in foro con-scienticc, from the difficulty of framing any general rules to meet them, and from the mischief and inconvenience which would arise from attempting judicially to enforce such duties *138 as charity, gratitude and kindness, or even positive engagements, where they are not founded on a valuable consideration, or, at least, on what is deemed a good consideration.
* # # * *
“ The truth then appears to be this : first, that a large portion of natural equity is left to be administered in foro conscientice; because in addition' to the difficulty of pro-pounding precise rules applicable to all cases, a greater detriment and inconvenience to the community would ensue from attempting to enforce it in the public courts, than from leaving it to the decision and the power of conscience, and to the various motives by which mankind are ordinarily influenced.”
The duty of a court of equity is performed when it decides in accordance with well-established principles, and decisions based upon the existing state of the law must be just, since the law is justice.